1

2

3

4

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10  MONTE LEE BRIDGES,

11          Petitioner,              No. CIV S-03-2338 RRB KJM P

12      vs.

13  D.L. RUNNELS, Warden,

14          Respondent.         FINDINGS AND RECOMMENDATIONS

15  _____/

16          Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17  habeas corpus under 28 U.S.C. § 2254.  He challenges his Shasta County conviction for robbery

18  and the finding that he had suffered prior strike convictions, along with other sentencing

19  enhancements.

20          Respondent alleges that the petition is not timely, that this court may not reach

21  several issues because of procedural default, and that the petition otherwise has no merit.

22  /////

23  /////

24  /////

25  /////

26  /////

1

I.  <u>Timeliness</u>

One of the changes the Antiterrorism and Effective Death Penalty Act (AEDPA) made to the habeas statutes was to to add a statute of limitations for filing a habeas petition:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post- conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244.

A conviction is final for purposes of the AEDPA statute of limitations at the expiration of the ninety day period for seeking certiorari, <u>Bowen v. Roe</u>, 188 F.3d 1157, 1159 (9th Cir. 1999).  In this case, the Supreme Court denied review on July 10, 2002; the ninety day period thus began to run on July 11, 2002 and expired on October 9, 2002. Fed. R. Civ. P. 6(a) (excluding the day from which the period begins to run from the calculation of the time); Lodged Document 5.  The statute of limitations began to run on October 10, 2002 and expired October 10, 2003.

/////

1    On February 6, 2003 in this court, petitioner filed a federal petition for a writ of

2 habeas corpus, containing both exhausted and unexhausted claims.  Bridges v. Runnels, Civ. No.

3 S-03-232 WBS KJM P.  Although this court advised petitioner he could file an amended petition

4 containing only the exhausted claims and then seek a stay of the federal proceedings, petitioner

5 did not do so and the case ultimately was dismissed on September 29, 2003.  Id. (Docket Nos. 13,

6 20, 23, 25, 27).  This federal habeas proceeding did not toll the statute of limitations.  Duncan v.

7 Walker, 533 U.S. 167 (2001).  However, during this time, petitioner also began to pursue

8 collateral relief in the state courts.

9    The statute of limitations is tolled during the pendency of any "properly filed"

10 state collateral attack on the judgment.  Nino v. Galaza, 183 F.3d 1003, 1006-07 (9th Cir. 1999).

11 In Carey v. Saffold, 536 U.S. 214, 218-21 (2002), the Supreme Court held that the AEDPA

12 statute of limitations is tolled not only between the actual filing and decision on a writ, but also

13 during those periods between filings as a petitioner works his or her way "up the ladder" through

14 higher courts to complete "one full round" of state court review of claims.  Id. at 217, 219-20.

15 However, in Evans v. Chavis, 546 U.S. 189, 126 S.Ct. 846, 852 (2006), the Supreme Court

16 directed the federal courts to determine whether a "gap" petition was delayed unreasonably, even

17 when a state court did not deny the petition as untimely.  The court suggested that a gap longer

18 than the thirty to sixty days permitted in states with written rules for filing might be reasonable,

19 while six months would not be.  Id. at 854.

20    Based on the prison mailbox rule of Houston v. Lack, 487 U.S. 266, 276 (1988), a

21 document is filed when it is given to prison authorities for mailing.  See also Patterson v.

22 Stewart, 251 F.3d 1243, 1245 n.2 (9th Cir. 2001).  One Court of Appeal has held that in the

23 absence of contrary evidence, it would assume that the document was delivered for mailing on

24 the date it was signed.  Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001); but

25 see Price v. Philpot, 420 F.3d 1158, 1165 (10th Cir. 2005) (inmate can establish date he delivered

26 /////

pleading to authorities by showing when it was logged into the prison mail system or by submitting a declaration or notarized statement setting forth the date of delivery to officials).

Petitioner signed his initial state habeas petition on April 28, 2003. It was filed in Shasta County Superior Court on May 1, 2003 and denied on May 23, 2003. Lodged Docs. 6 & 7. A subsequent petition, dated August 8, was filed on August 27, 2003 in the Court of Appeal and denied on September 25, 2003. Lodged Docs. 8 & 9. He pursued the matter to the California Supreme Court; his petition for review, signed on October 2 and filed on October 6, 2003, was denied on November 12, 2003. Lodged Docs. 10 & 11.

Petitioner is entitled to 121 days of tolling for the foregoing round of state collateral proceedings: Using the date the superior court petition was signed, that action was pending twenty-five days. Although petitioner is not entitled to tolling during the seventy-six day gap between the superior court's denial and the date the Court of Appeal petition was signed, Evans, 126 S.Ct. at 852, the gap between the Court of Appeal's denial and the Supreme Court filing was within the Evans court's definition of reasonable, so the statute of limitations was tolled from August 8 to November 12, 2003, a total of an additional ninety-six days. This extended the statute of limitations applicable to the filing of the federal petition to February 9, 2004.[1]

Petitioner returned to this court with the instant petition on December 8, 2003, within the statute of limitations. See Docket No. 1. On June 28, 2004, respondent moved to dismiss the petition, arguing that it, too, was a mixed petition. Docket No. 28. In findings and recommendations issued February 3, 2005, this court found that the petition presented one exhausted and five unexhausted claims and, because it was mixed, it was subject to dismissal. It advised petitioner he could file an amended petition containing only the exhausted claim and

_____

[1] The new date was February 8, 2004, but because that day was a Sunday, the statute of limitations did not expire until Monday, February 9. Sain v. City of Bend, 309 F.3d 1134, 1138 (9th Cir. 2002).

could seek a stay of the proceedings while he exhausted the remaining five claims.  Docket No.

34.  The district court adopted these findings and recommendations on March 1, 2005.

Thereafter, the case was reassigned from Judge Shubb to Judge Levi, which prompted petitioner

to file a request for reconsideration on March 21, 2005.

On March 30, 2005, the Supreme Court decided Rhines v. Weber, 544 U.S. 269

(2005), which made clear that a district court has the discretion to stay a mixed petition to permit

exhaustion of state remedies.  On June 24, 2005, the district court denied the request for

reconsideration without considering the impact of Rhines.

While the motion for reconsideration was pending, petitioner returned to the state

courts to exhaust the five claims respondent had identified as being unexhausted, a process that

was completed on July 27, 2005.  Lodged Doc. 17.  Petitioner then filed his amended petition in

this court on August 11, 2005.  Respondent admits that petitioner has exhausted his state

remedies as to the claims contained in the instant petition, but argues that it is not timely and

does not relate back to the earlier petitions.  Answer, ¶¶ XX, XXIII.

In Raspberry v. Garcia, 448 F.3d 1150, 1152 (9th Cir. 2006), the court considered

whether an untimely habeas petition related back to a timely, but completely unexhausted

petition that had been dismissed.  The court noted:

> [A] habeas petition filed after the district court dismisses a
> previous petition without prejudice for failure to exhaust state
> remedies cannot relate back to the original habeas petition.  This
> holding does not limit the district court's equitable power to
> correct mistakes.

Id. at 1155.

In Anthony v. Cambra, 236 F.3d 568, 573 (9th Cir. 2000), the district court had

dismissed a mixed petition without giving the petitioner leave to file an exhausted petition and

seek a stay.  Petitioner later filed an amended petition containing only the exhausted claim and

asked the court to stay the proceedings to permit him to exhaust the other claims.  The district

court treated this later petition as an amendment that related back to the original timely filing.

5

1   The Ninth Circuit approved the district court's use of its equitable powers to correct the mistake

2   it had made in dismissing the original petition without giving petitioner leave to amend.  Id. at

3   573-74.  It also found that the still later petition, following exhaustion, was timely because it

4   related back to the first mixed petition.

5            In this case, between the dismissal of the timely filed, mixed petition in this case

6   and the district court's denial of petitioner's motion for reconsideration, Rhines changed the way

7   in which a district court should approach a mixed petition, for Rhines held that dismissal is not

8   appropriate if the petitioner satisfies certain requirements for a stay.  It appears that the district

9   court may not have fully considered the impact of Rhines on petitioner's motion for

10  reconsideration, which might have led it to determine that the petition filed December 8, 2003

11  need not have been dismissed.  Accordingly, this court exercises its equitable powers to correct

12  this potential mistake and will deem the petition filed August 11, 2005, to relate back to the

13  timely petition filed December 8, 2003.

14  II.  Procedural Default

15           Respondent argues that petitioner is procedurally barred from raising grounds

16  contained in claims one, two and five of the amended petition.  Mem. P. & A. in Supp. Answer

17  (Answer) at 15-19.

18           A federal court will not review a claim of federal constitutional error raised by a

19  state habeas petitioner if the state court determination of the same issue "rests on a state law

20  ground that is independent of the federal question and adequate to support the judgment."

21  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's

22  determination is based on the petitioner's failure to comply with procedural requirements, so

23  long as the procedural rule is an adequate and independent basis for the denial of relief.  Id. at

24  730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-established at

25  the time of the [] purported default."  Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997).  For

26  the bar to be "independent," it must not be "interwoven with the federal law."  Michigan v. Long,

463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not

consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a

result of the alleged violation of federal law, or demonstrate that failure to consider the claims

will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

            In Bennett v. Mueller, the Ninth Circuit held:

> Once the state has adequately pled the existence of an independent
> and adequate state procedural ground as an affirmative defense, the
> burden to place that defense in issue shifts to the petitioner. The
> petitioner may satisfy this burden by asserting specific factual
> allegations that demonstrate the inadequacy of the state procedure,
> including citation to authority demonstrating inconsistent
> application of the rule. Once having done so, however, the ultimate
> burden is the state's.

322 F.3d 573, 586 (9th Cir. 2003).

        Because respondent raises different bases for the default as to claim one from that

as to claims two and five, the default issues will be addressed separately.

    A.  Claim One

        Petitioner argues that the prosecutor committed Griffin error in closing argument,

suborned perjury, misled the court, defied the court's in limine ruling and was "disingenuous

throughout." Am. Pet., Points and Authorities (Am. Pet.) at 1.  Respondent argues that several of

these issues were raised on direct appeal, but the Court of Appeal refused to recognize them

because petitioner had not objected below.  Answer at 17-18.  Petitioner does not specifically

reply to these arguments in his traverse.

        On direct appeal, petitioner argued that the prosecutor committed misconduct

during summation by arguing that petitioner's debts and poverty gave him a motive to rob U.S.

Bank, in violation of the trial court's determination that these factors could not be so considered.

RT 842, 860 (court's ruling & instruction), 867 (argument; petitioner was behind in his rent),

868-869 (petitioner was overdrawn on occasion and generally had no money at the end of the

/////

1   month), 878 (petitioner able to pay the rent the day after the robbery), 922, 925, 927 (rebuttal;

2   petitioner was behind on his rent).

3           He also argued that the prosecutor vouched for the strength of his case and for the

4   credibility of eyewitnesses.  RT 864 (look at witness's testimony as a whole), 872 ("I've . . .

5   proven that . . . John Bush could not have committed the robbery), 875 (defense witness who

6   identified Bush made a mistake), 924 (although one witness made a mistake, there are other

7   eyewitnesses), RT 927 (he could say he had proven the case beyond any doubt).  See generally

8   Lodged Doc. 1 at 27-34 (opening brief on direct appeal).

9           Finally, he claimed that the prosecutor had committed misconduct in asking Agent

10  Skeen whether he had questioned petitioner about his poverty and whether the U.S. Bank would

11  have caught petitioner's eye as he was pacing in his kitchen, wondering how he would pay his

12  rent.  Lodged Doc. 1 at 33; RT 650 (questioning about bank balance), 639 (pacing in the

13  kitchen).

14          The Court of Appeal ruled that "[b]ecause defendant failed to object to any of the

15  now-claimed objectionable comments and question and request an admonition. . . defendant has

16  failed to preserve this claim for appeal."  Lodged Doc. 3 at 7.  Respondent argues that this ruling

17  bars federal review.

18          Under California law, a judgment may not be reversed by reason of the erroneous

19  admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or

20  to strike the evidence that was timely made and so stated as to make clear the specific ground of

21  the objection or motion."  Cal. Evid. Code § 353(a).  In Melendez v. Pliler, 288 F.3d 1120, 1125

22  (9th Cir. 2002), the Ninth Circuit held that California's contemporaneous objection doctrine is

23  clear, well-established and has been consistently applied when a party has failed to make any

24  objection to the admission of evidence.  Because petitioner has not taken issue with the

25  application of California's contemporaneous objection rule, this court will not consider these

26  portions of petitioner's first claim.  Because respondent has not argued any other bar to this

8

1    court's consideration of the remainder of petitioner's claims of prosecutorial misconduct, this

2    court will reach their merits.

3         B. Claims Two And Five

4              Petitioner argues that he was denied the effective assistance of counsel because

5    counsel failed to interview unimpeachable witnesses, investigate petitioner's mental health,

6    introduce salient facts, make timely objections, call and question favorable witnesses, or explain

7    petitioner's "stash" and because he gave closing argument when he was "stressed out," neglected

8    to review petitioner's priors, and suborned perjury of Agent Skeen and print examiner Phillips.

9    Am. Pet. at 7-10 (ground two).  He also claims that a friend of the Sheriff of Shasta County was

10   the jury foreman and two other jurors had law enforcement ties, leading to "isolatable

11   demonstrated prejudice." Id. at 12 (ground five).

12             In petitioner's first state habeas petition, he challenged the fairness of the jury

13   because of the foreman's friendship with the sheriff and the law enforcement connections of two

14   other jurors.  In addition, he claimed trial counsel had been ineffective because he failed to contact

15   exculpatory witnesses in a timely fashion, failed to call witnesses concerning the taking of

16   petitioner's fingerprints, and did not exercise a peremptory challenge against the sheriff's friend.

17   See Doc. 34 at 2-3 (findings and recommendations of 2/3/05 identifying claims).  Respondent

18   notes that the Shasta County Superior court rejected these claims with a citation to In re Dixon, 41

19   Cal.2d 756 (1953) in ruling on petitioner's first state habeas petition.  Answer at 18.  A citation to

20   Dixon means the issues should have been raised on direct appeal.  Park v. California, 202 F.3d

21   1146, 1151 (9th Cir. 2000).

22             In Park, the Ninth Circuit held that California's Dixon rule was interwoven with

23   federal law because application of the Dixon rule depended on a state court determination that

24   federal constitutional error had not been committed.  At the same time, the Ninth Circuit

25   recognized that in In re Robbins, 18 Cal.4th 770, 811-12 (1998), the California Supreme Court

26   held that it no longer would consider federal law when deciding whether claims were procedurally

1  defaulted.  Park, 202 F.3d at 1152-53.  The Ninth Circuit noted that Robbins made clear its new

2  approach would not be retrospective and so it did not apply when Park's habeas petition was

3  decided.  Id. at 1152-53.  Therefore, the Ninth Circuit did not decide if Robbins established the

4  independence of the Dixon rule.  Id.

5       The Ninth Circuit has addressed an application of another procedural bar following

6  Robbins, in Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003), cert. denied sub nom. Blanks v.

7  Bennett, 540 U.S. 938 (2003).  Bennett holds that because California courts can no longer

8  consider federal law when considering if there is an exception to California's untimeliness bar, a

9  post-Robbins application of the untimeliness bar is based on an independent state ground.  Id. at

10  581-82.

11       Bennett's rationale is equally applicable to the Dixon bar applied to petitioner's

12  habeas claim, as suggested in the Bennett decision itself.  Id. at 582.  In Park, the Ninth Circuit

13  recognized that the California Supreme Court created the Robbins approach "to establish the

14  adequacy and independence of the State Supreme Court's future Dixon/Robbins rulings . . . ."

15  Park, 202 F.3d at 1153 n.4.  Because petitioner's habeas petition was considered by the California

16  courts in 2003, several years after the Robbins decision issued in 1998, the California courts

17  considered only state law when they determined that petitioner's claim was barred under In re

18  Dixon.  Therefore, after Robbins, the Dixon bar is an independent state procedural ground.

19       Respondent has pled the independence of the Dixon rule in his answer to the

20  habeas petition.  Answer, ¶ XXII; id. at 18-19.  Petitioner, in his reply, does not make any

21  arguments and provides no citations to show that the Dixon rule is dependent on federal law.

22  Reply (called Denial and Exception) at 2-3.  The court finds that the Dixon bar is independent

23  from federal law.

24       Not only does the Dixon rule have to be independent, it also must be an adequate

25  state ground.  For a state procedural rule to be adequate, the rule must be "well-established and

26  consistently applied."  Bennett, 322 F.3d at 583.  In Fields v. Calderon, 125 F.3d 757, 760 (9th

1   Cir. 1997), the Ninth Circuit held that the Dixon rule was not an adequate state ground.  In Fields,

2   the Ninth Circuit held that the California Supreme Court had recognized that the Dixon rule had

3   been inconsistently applied prior to In re Harris, 5 Cal.4th 813 (1993), and therefore, the Dixon

4   rule was not an adequate state ground in cases decided before the Harris decision.  Fields, 125

5   F.3d at 763-65.

6          However, this case deals with an application of the Dixon rule after the Harris

7   decision.  In Fields, the Ninth Circuit also recognized that Harris, along with a companion case,[2]

8   was "intended to reestablish California's procedural rules governing state habeas petitions and

9   clearly define and limit the applicable exceptions."  Fields, 125 F.3d at 763-64.  Harris was

10  intended to make application of the Dixon rule consistent and uniform in California courts after

11  1993.

12         The adequacy of a state procedural rule is determined by considering if a

13  procedural rule "was firmly established and regularly followed at the time of [the] purported

14  procedural default."  Calderon v. U.S. District Court, 96 F.3d 1126, 1130 (9th Cir. 1996).  For

15  cases involving the Dixon rule, the Ninth Circuit has held that the time of the purported default is

16  the time when the petitioner had the chance to raise claims on direct appeal.  Id. at 1131.

17  Petitioner filed his opening brief in the state Court of Appeal in July 2001, see Lodged Doc. 1,

18  eight years after Harris.

19         Respondent has satisfied his burden of initially pleading the adequacy of the Dixon

20  bar.  This shifts the burden to the petitioner to set forth specific authorities that demonstrate that

21  the Dixon rule was applied inconsistently in 2001, at the time petitioner could have raised his

22  claims on direct appeal.  Bennett, 322 F.3d at 586.  In his reply, petitioner makes no argument nor

23  produces any evidence to prove that the Dixon rule was applied inconsistently in 2000.  Therefore,

24  the petitioner has not carried his burden.  The court finds that the Dixon rule, applied in 2000, is

25

26         [2] In re Clark, 5 Cal. 4th 750 (1993).

an adequate state bar.  Because the <u>Dixon</u> bar is independent and adequate, those portions of claim two that had been raised in the 2003 state habeas petition[3] and all of claim five are procedurally barred unless there is an exception to the rule.

Although a procedural default may be excused if there is cause for the default and prejudice from the failure to consider the defaulted issues, petitioner has made no showing or even argued to suggest the existence of either cause or prejudice.  <u>Coleman v. Thompson</u>, 501 U.S. at 749-50.

III.  <u>The Facts Of The Offense</u>

> About 2:30 p.m. on May 5, 2000, at the U.S. Bank in Redding, a man wearing a hat and sunglasses, later identified as defendant, stood in line waiting for the merchant teller, Alicia Miller.  When it was his turn, he approached Miller's window and presented a note which instructed the teller to give him large bills, not to press any alarms and, if she did not comply, she would not see her family. She gave him 50 and 100-dollar bills totaling approximately $8,700 which she placed in an envelope as instructed.  Miller was nervous and scared and did not think to give defendant the specially marked money.  Katrina Dufer, another teller, recalled defendant waiting in line and when it was his turn, he stated that he would rather wait for the merchant teller.  Dufer noticed Miller looking pale and defendant leaving the bank.  The bank manager, Robert Warren, was informed by a customer that something strange was happening at the merchant teller window. Warren saw defendant leave the bank.  He walked within 18 feet of Warren.
>
> Redding Police Detective John Ostrowski investigated the robbery. Initially, John Bush was mentioned as a possible suspect. Ostrowski saw Bush that day about 4:00 p.m. at a bus stop and detained him.  Another officer spoke with Bush and released him.
>
> On the day of the robbery, May 5, 2000, Richard Cook, the shift manager of the Casino Club in Redding, talked to defendant who was a regular gambler at the club since the summer or fall of 1999. Defendant told Cook that he had enough money to buy Cook's car but not to tell anyone that he (defendant) had money.  Defendant bought over $1,000 worth of chips that night.  The most defendant had previously lost in a single night was about $300.  The next night, defendant left the club after losing all he had.  He later returned with $4,000 in 50 and 100-dollar bills to buy chips.  Cook

---

[3]  Respondent has not identified any other procedural bar to this court's consideration of the remainder of petitioner's claims of ineffective assistance of counsel.

had heard about the bank robbery and called the police.  The description of the robber matched defendant.  Cook informed the police about the amount of money defendant had the day of and the day after the robbery.

Defendant's home, a room at the downtown hotel for low income seniors, was searched.  Officers found $3,000—$1,000 in 100-dollar bills in three separate locations.  The U.S. Bank's address and phone number were circled in defendant's telephone books, both the yellow and white pages.  The U.S. Bank, located a block away from defendant's home, is clearly visible from his kitchen window.

When defendant was interviewed, he admitted the telephone books belonged to him.  He claimed he had never loaned the books to anyone.  When he was asked about the bank being circled, defendant initially claimed he had not circled it.  Later he said he did not know why, but thought he may have circled it when he was looking for a bank in which to open a new account.  He claimed the $3,000 found in his home were savings and gambling profits.

Defendant's bank statements found in his home showed that for several months, deposits never exceeded $900 and ending balances were less than $100 except the last month which showed a deposit of $2,464.00.  Defendant had been two months late on his rent.  On May 6, 2000, defendant paid the rent owed with money orders.

After defendant was arrested, he refused to participate in a live lineup.  Detective Ostrowski prepared a photo lineup.  Miller, Dufer and Warren identified defendant from the photo lineup and in court.  Miller and Dufer had no doubt defendant was the robber.  Warren was initially 90 percent certain but changed it to 100 percent.  A customer in the bank was not sure of his identification of defendant.

Defendant's palm print was found on the merchant teller counter.  A surveillance videotape of the bank robbery was played for the jury.

Defendant's theory was that Bush was the perpetrator of the U.S. Bank robbery.  On May 5, 2000, Kevin Collins went to a location near the bank to repair a copier.  At 1:00 p.m., as Collins pulled into the parking lot, he passed a truck pulling out of the parking lot.  Collins described the driver as 5 feet 10 inches tall, medium build, sporting a short, trimmed beard, and wearing a red, white and black flannel shirt.  Collins identified John Bush as the driver from a photograph.  Collins was 90 percent certain.

Lodged Document 3 (Court of Appeal opinion) at 2-5.

/////

/////

13

IV.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA).  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[4]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

---

[4]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . .  At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

1        The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

2 different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to"
> clause if the state court applies a rule different from the governing
> law set forth in our cases, or if it decides a case differently than we
> have done on a set of materially indistinguishable facts.  The court
> may grant relief under the "unreasonable application" clause if the
> state court correctly identifies the governing legal principle from our
> decisions but unreasonably applies it to the facts of the particular
> case.  The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and we stressed in Williams [v. Taylor,
> 529 U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

10 Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law

11 set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to

12 cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8 (2002).

13        The court will look to the last reasoned state court decision in determining whether

14 the law applied to a particular claim by the state courts was contrary to the law set forth in the

15 cases of the United States Supreme Court or whether an unreasonable application of such law has

16 occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails to give

17 any reasoning whatsoever in support of the denial of a claim arising under Constitutional or

18 federal law, the Ninth Circuit has held that this court must perform an independent review of the

19 record to ascertain whether the state court decision was objectively unreasonable.  Himes v.

20 Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court

21 applied the correct law, and analyzes whether the decision of the state court was based on an

22 objectively unreasonable application of that law.

23        It is appropriate to look to lower federal court decisions to determine what law has

24 been "clearly established" by the Supreme Court and the reasonableness of a particular application

25 of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

26 /////

V.  <u>Prosecutorial Misconduct</u>

    A.  <u>Suborning Perjury Of Agent Skeen And Print Examiner Phillips</u>

        Petitioner argues that the prosecutor suborned perjury from Agent Skeen when the latter described finding money and the phone book with U.S. Bank circled in petitioner's room before petitioner told him where money was hidden.  RT 628-629, 632, 652.  He also claims that Skeen was lying when he testified that he told petitioner he was free to leave the interview at the police station following the search.  RT 632.  In addition, he contends that the prosecutor suborned perjury from print examiner Phillips, when she identified a partial palm print taken from the merchant teller's counter as petitioner's, because he failed to elicit the testimony that print identification is subjective, that the print was only a third of the palm, and that the match came weeks after the arrest.  RT 545, 552-582; Pet. at 4-5.

        A conviction violates the Fourteenth Amendment if it is obtained by the use of perjured testimony the prosecutor knows to be false.  <u>Napue v. Illinois</u>, 360 U.S. 264 (1959).  It is petitioner's burden to demonstrate that the challenged testimony was false, that the false testimony was material, and that the prosecutor knew the testimony was false when it was presented.  <u>Chambers v. Johnson</u>, 218 F.3d 360, 363-64 (5th Cir. 2000).  A witness "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."  <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993).  Not every discrepancy in testimony translates into perjury.  <u>Lambert v. Blackwell</u>, 387 F.3d 210, 249 (3d Cir. 2004), <u>cert. denied</u>, 544 U.S. 1063 (2005).

        In this case, petitioner has presented his own statement under penalty of perjury that Skeen had not found the money until petitioner told him where to find it in his apartment.  Memorandum/Statement In Support Of Petition (Statement) at 2.  Assuming that this satisfies his burden of showing that Skeen's testimony was false, petitioner has presented absolutely nothing showing the prosecutor knew the testimony was false.

/////

1    During the examination of the officer who lifted the prints from U.S. Bank and the

2   print examiner, the prosecutor elicited the fact that the palm print was a partial palm print and

3   during the examination of the print examiner, established that there was a discrepancy between the

4   date the examiner claimed to have made the identification and the date that the conclusion was

5   released.  RT 503 (partial palm print), 548 (timing of identification), 551 (partial palm print).

6   During several points in her testimony, the print examiner testified she was one hundred percent

7   certain of her identification of the palm print as petitioner's.  RT 545, 552.  Given his witness's

8   certainty, it was hardly misleading for the prosecutor to fail to establish that the identification of

9   palm prints is subjective, not scientific.  Pet. at 5.

10       B.  The Line Up Card

11    Petitioner argues that the prosecutor admitted that the line-up card was tainted and

12  then argues that his conviction was based on an impermissibly suggestive identification.  Pet. at 4.

13  This claim is based on a complete misreading of the pages of the record to which petitioner

14  himself refers.

15    Before the trial began, the parties discussed how to address the question of the

16  search of petitioner's apartment without revealing that it was a parole search.  The prosecutor

17  said:

18         I'm concerned that the jurors are going to say . . .what's going on
           here. . . just because somebody spends a little more money
19         gambling, the police barge into his house and do a search? . . . I
           can't help but worry that there's going to be some concern on the
20         part of the jurors as to the police behavior, and that could backfire
           when there is some other contradictory evidence introduced to
21         contradict, for example, a victim's identification.

22         Obviously on an identification case the police behavior is at all
           times suspect, whether or not this identification was done fairly,
23         whether it was coerced , whether or not the defendant was
           adequately represented in the photo spread.  It all goes to the police
24         conduct, and if we start sowing the seeds of any type of abuse or
           police misconduct or overzealousness on the part of the police , that
25         could carry over into some of the other evidence which in and of
           itself is good evidence.

26

1
> However, when certain issues are raised by the defense which are
> always raised in cases of identification, jurors may wind up
2
> bootstrapping their original concern with the concern they have on
> subsequent police conduct . . . .
3

4  RT 23-24.  The court asked how the prosecution's position was compromised if the defense

5  stipulated that the search was lawful.  RT 24.  The prosecutor returned to his theme:

6
> Well, especially in this area of California there are a lot of people
> that believe very strongly in the constitution.  They are somewhat
7
> skeptical of law enforcement to begin with.  They are very
> concerned with civil liberties, and they may say to themselves I
8
> don't care if the defendant thinks they had a right to go in there.  I
> would like to know what right they had to go into somebody's
9
> house and search them just because they got a tip that he was
> spending more money gambling that day than on other days.  I am
10
> offended by that.  And you know something, now that I think about
> it, maybe that photo show-up was a little suggestive or, who knows,
11
> maybe the police . . . focused in on this person for no reason just
> because he was a gambler.  Maybe they coached the ID witnesses a
12
> little bit.

13  RT 25.  In neither instance did the prosecutor admit that the line-up was tainted; instead, he was

14  speculating about what flights of fancy, in his view, a juror might indulge in if he or she believed

15  the search was not lawful.  This claim of error is frivolous.

16      C.  <u>Deceit About Gambling Amounts</u>

17      Petitioner complains that the prosecutor mischaracterized petitioner as a $10 to $20

18  gambler, when he knew that the games required a $40 buy-in.  Pet. at 5.

19      Richard Cook, a shift manager at the Casino Club in Redding, testified that the

20  club ran "set limit games, which are poker in a certain amount that you may bet at any given time.

21  It's a lower amount, our normal game is $5 and betting limits going anywhere from four to eight

22  to ten to twenty, fifteen to thirty."  RT 459.  He added that generally, the "minimum buy [of chips]

23  that you had to make in a game was $40."  RT 461.  Cook testified that before the robbery,

24  petitioner bought from $20 to $200 in chips in a night and that the most he had lost in a night

25  before then was $300.  RT 461.

26  /////

1   The prosecution's characterization of petitioner's gambling habits as spending

2   "only ten or twenty dollars, at the most," RT 176, was indeed incorrect in light of Cook's

3   testimony.  However, the jurors heard Cook's testimony and were instructed that testimony was

4   evidence they could consider, but a lawyer's argument and questions were not.  CT 141, 145;

5   RT 804, 806.

6   Moreover, petitioner has not demonstrated that the prosecutor's incorrect

7   characterization of his gambling habits was material.  It mattered little whether he was a $10 to

8   $20 gambler as opposed to a $40 gambler in light of Cook's testimony that before the robbery, the

9   most petitioner lost in a single sitting was $300, whereas in the two days following the robbery,

10  petitioner purchased $4,000 worth of chips.  RT 461-463.

11  D.  Deceit About The Warrantless Search

12  Petitioner presents little explanation of the deceit he attributes to the prosecutor.

13  His reference to pages 22 and 23 of the reporter's transcript is a reference to the discussion

14  mentioned earlier about sanitizing the basis of the search so as not to refer to petitioner's status as

15  a parolee.  RT 22-23.  To the extent petitioner is relying on his claim that Skeen did not find the

16  money until petitioner revealed the location, as outlined in the statement attached to his petition,

17  he has not, as noted above, shown that the prosecutor was aware of the discrepancy in the

18  accounts.  Statement at 2.

19  /////

20  /////

21  /////

22  /////

23  /////

24  /////

25

26

VI.  Ineffective Assistance Of Trial Counsel[5]

Petitioner alleges that trial counsel did not represent him effectively in several different ways.  The federal law on claims of attorney ineffectiveness is clear:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.

It is also petitioner's burden to establish prejudice:  "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  This evaluation must be based on the totality of the evidence before the jury, recognizing the probability of a different outcome is reduced when the government's case is strong.  Bragg v. Galaza, 242 F.3d 1082, 1088, as amended, 253 F.3d 1150 (9th Cir. 2001).   Moreover, when a petitioner claims defense counsel failed to call certain witnesses, he must demonstrate the "helpful testimony for the defense" they could have presented.  Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000).

A.  Failure To Investigate Mental Health History And Use Of Xanax

"Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."  Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir. 2003).  Petitioner has presented only a single sentence in his federal writ petition even suggesting that there was anything to investigate.  Pet. at 8.  However, the Clerk's Transcript does contain a copy of a declaration petitioner signed in support of a motion to strike one or both of his prior strike convictions, in which he averred that he had committed his prior bank robberies in

---

[5]  As noted in section II above, this court will not reach portions of the claim of ineffectiveness because of the procedural bar.

1   order to secure mental health treatment or to commit "suicide by cop."  CT 331-332.

2            Even if counsel can be deemed not to have investigated that history adequately, he

3   has not shown that any such failure was prejudicial.  Petitioner has maintained his innocence

4   throughout the proceedings in state court and in this court as well; his mental health history would

5   have some relevance to his guilt only if he had claimed that he lacked the mental state necessary

6   for the crime.

7            To the extent plaintiff is faulting counsel for failing to present more information on

8   his mental health at sentencing, his claim is even weaker.  At the sentencing hearing, counsel did

9   present petitioner's mental health records from 1994, in support of petitioner's claim that he

10  committed that series of robberies in a period of extreme depression, which impelled him to

11  attempt "suicide by cop" by robbing the banks.  See RT 1051-1053.  The trial court considered the

12  records, but still found that the three-strikes sentence was appropriate.  RT 1063.  Petitioner has

13  not suggested what else counsel could have presented that would have had an impact on the

14  court's determination.

15          B.  Failure To Introduce Evidence Of Petitioner's Bank Loan

16          Petitioner argues that trial counsel was ineffective for failing to introduce evidence

17  that petitioner had obtained a bank loan as a way of explaining the source of the $3,000 found in

18  petitioner's room.  Pet. at 8; Statement at 2.

19          This court has directed the record expanded to include the three sealed hearings

20  prompted by petitioner's desire to have new counsel appointed.  In the hearing of January 12,

21  2001, petitioner complained about counsel's failure to introduce evidence of a $2,500 loan from

22  Bank of America in order to show the source of the $3,000 found in his room.  RT 1042.

23          Counsel said petitioner had not mentioned the loan to the police when they

24  questioned him about the source of the $3,000 found in his apartment and so he made a tactical

25  decision not to introduce any such information.  RT 1044.  Petitioner protested that he had

26  mentioned the loan, but counsel countered that it was not on the videotape of the interview.

21

RT 1044-1045.  Counsel said his tactical decision was based also on the problem with explaining

petitioner's need to take out a loan if he already had "a substantial amount of money built up."

Id.[6]

In Strickland,

> [S]trategic choices made after thorough investigation of law and
> fact relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigations are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations
> unnecessary.  In any ineffectiveness case, a particular decision not
> to investigate must be directly assessed for reasonableness in all
> circumstances, applying a heavy measure of deference to counsel's
> judgments.

466 U.S. at 691.  In this case, it is not clear whether counsel failed to determine whether in fact

petitioner had secured a loan; petitioner has presented nothing to show that he had, in fact, secured

one.  However, his tactical determination not to present the information was based on maintaining

the credibility of petitioner's statement to Skeen, which had not included any information about

the loan as the source of the money in his room.  Petitioner has not borne his burden of showing

that this tactical determination was constitutionally ineffective.  Brodit v. Cambra, 350 F.3d 985,

993 (9th Cir. 2003) (counsel's decision not to present exculpatory evidence not ineffective when it

was made in order to avoid the introduction of negative character evidence).

C.  Failure To Object To Evidence Of Petitioner's Poverty

The trial court ruled that the prosecution could not argue that evidence of

petitioner's poverty suggested a motive for robbing the bank, but his acquisition of unexpected

wealth could be used circumstantially to show that he had, indeed, committed the robbery.

RT 842, 845-846.  Petitioner argues that defense counsel was ineffective in failing to object to the

---

[6] Counsel questioned Skeen about petitioner's statement on the day of his arrest and established that petitioner said for about a year he had saved about half of his monthly income of $750 and added his winnings from the Casino Club to the stash.  RT 654.

prosecutor's references to petitioner's poverty, which in turn failed to preserve the issue for appellate review.  Pet. at 9.  A failure to object to inadmissible evidence may constitute ineffective assistance of counsel.  Crotts v. Smith, 73 F.3d 861, 866 (9th Cir. 1996).  As with all such claims, however, petitioner must show prejudice from counsel's failure.  Smith v. Pliler, 280 F. Supp. 2d 990, 1000 (N.D. Cal. 2003).

This court need not consider whether counsel was ineffective, for petitioner cannot show prejudice.  The trial court instructed the jury:

> Ladies and gentlemen of the jury, during the trial evidence was introduced which may tend to indicate the defendant was in debt or impoverished prior to the events giving rise to the crime charged. Such evidence was not introduced for the purpose of and you may not consider it as evidence of motive to have committed the crime of robbery.  Thus, references to the defendant's bank balances and the status of his rent payments at the Lorenz Hotel should not be considered by you as indicating motive to have committed the crime charged and you are instructed to disregard the Court's previous instruction on motive.  However, you may consider this evidence to the extent it assists you in determining any other issue in the case. The weight to be given such evidence is for you to decide.

RT 860-861.  It is generally presumed that jurors follow the court's instructions regarding whether, and in what respect, something can be considered evidence.  See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997); see also Greer v. Miller, 483 U.S. 756, 767 n.8 (1987) (juries are presumed to follow instruction to disregard inadmissible evidence).  Moreover, petitioner has not shown, or even argued, that evidence of unexplained wealth is inadmissible as circumstantial evidence of robbery.  See United States v. Mitchell, 172 F.3d 1104 (9th Cir. 1999) (while poverty is not admissible to show motive for robbery, "an unexplained abrupt change of circumstances is not merely proof of motive, but also amounts to circumstantial evidence of the crime").

D.  Failure To Investigate Petitioner's Priors

Petitioner argues that counsel failed to investigate the priors used to impose the three strikes sentence, even though he was aware that petitioner had represented himself in United States v. Bridges, Cr. S-94-275 DFL (E.D. Cal.), as a result of the federal defender's alleged

1    incompetence in that case.  Pet. at 9.

2          In <u>Garcia v. Superior Court</u>, the California Supreme Court held:

3          [A] defendant whose sentence for a noncapital offense is subject to
enhancement because of a prior conviction may not employ the
4          current prosecution as a forum for challenging the validity of the
prior conviction based upon alleged ineffective assistance of
5          counsel in a prior proceeding.

6    14 Cal.4th 953, 966 (1997).  In light of <u>Garcia</u>, counsel was not ineffective for undertaking what

7    would be an essentially futile investigation.  <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996)

8    ("the failure to take a futile action can never be deficient performance").

9        E.  <u>Arguing When "Stressed Out"</u>

10          Before closing argument, counsel noted that he had felt dizzy and light headed.

11    RT 824.  The court eventually recessed early to allow counsel the evening to rest.  RT 829-830.

12    When counsel returned the next morning, he said he felt a little under the weather, but nonetheless

13    capable of representing petitioner effectively.  RT 832.  He gave his summation later that day.

14    RT 881.

15          Petitioner claims that counsel was ineffective for arguing when he was ill or

16    "stressed out."  Pet. at 8.  He has not identified any problems with the argument attributable to

17    counsel's illness or otherwise suggested how he was prejudiced by counsel's physical condition.

18    Without a showing of prejudice, petitioner cannot prevail on this claim of ineffective assistance of

19    counsel.  <u>Cf</u>. <u>Smith v.Ylst</u>, 826 F.2d 872, 876 (9th Cir. 1987) (habeas petitioner must show

20    prejudice flowing from trial counsel's mental illness).

21        F.  <u>Suborning Perjury Of Skeen And Phillips</u>

22          As noted above, there is no evidence that Phillips perjured herself in identifying the

23    partial palm print as petitioner's.  <u>Cf</u>. Pet. at 8-9.  Moreover, counsel cross-examined Phillips with

24    some vigor, establishing how small, blurred and indistinct the print was.  <u>See</u> RT 555, 557, 560.

25          In addition, counsel questioned Skeen about finding the money, but Skeen

26    maintained that he found the money independently and that those locations matched what

1  petitioner told them in the subsequent interview.  RT 653.  Petitioner chose not to testify and has

2  not otherwise suggested how counsel was to prove that Skeen was lying about the sequence of the

3  search.  RT 856-857.

4  VII.  Trial Court's Errors[7]

5      A.  Allowing Prosecutor To Refer To Petitioner's Poverty

6          As noted above, any error in the prosecutor's reliance on petitioner's poverty was

7  cured by the court's instruction.  Cf. Pet. at 11.

8      B.  Allowing Perjury

9          Even assuming that Skeen and Phillips perjured themselves, there is no basis in the

10  record for concluding that the trial court was aware the testimony was not truthful.  Pet. at 11.

11      C.  Determining The Search Was Legal

12          Petitioner has pointed to nothing in the record that would have alerted the trial

13  court to any improprieties in the search of his room.  Pet. at 11.

14      D.  Allowing Use Of The Tainted Line-up Card

15          Once again, there is nothing in the record suggesting that the line-up card was

16  tainted or that the court was somehow aware of any taint.  Pet. at 11.

17      E.  Exclusion Of The Evidence Of Third Party Culpability

18          Petitioner argues that the trial court erred in excluding evidence of John Bush's

19  robbery of Wells Fargo and a videotape of John Bush in which he admitted he robbed the U.S.

20  Bank.  Pet. at 11.

21          At a hearing on the admissibility of this evidence, Redding police officer Michael

22  Thomas testified that he interviewed Bush in connection with the robbery of a Wells Fargo Bank

23  and asked about a 1999 robbery of Bank of America, which Bush had apparently admitted during

24

25  [7]  As noted in section II above, petitioner's claim that he was denied an impartial jury
    because several jurors had law enforcement ties is barred.  In this section, petitioner recasts the
    claim as trial court error in permitting jurors with such ties to sit, which is the same claim with a

26  slightly different semantic flavor.  It will not be considered under this general claim of error.

1  an interview with an FBI agent.  RT 711-712.  Bush said he thought he robbed the U.S. Bank.

2  RT 712.  Bush was "somewhat intoxicated" during the interview and gave long, convoluted

3  answers.  Id.  His description of that robbery was consistent with the 1999 Bank of America

4  robbery.  RT 721-723.

5          Thomas also described Bush's modus operandi during the Wells Fargo robbery:

6  Bush came into the bank, wrote a note while in the bank, stood in line for a teller, engaged the

7  teller in a non-robbery related conversation and then presented the demand note.  He did not wait

8  for the merchant teller.  He was not wearing a disguise.  He simulated reaching to his rear

9  waistband on several occasions.  RT 718-719.  He was arrested attempting to leave the area in a

10  taxi.  RT 720.  He was intoxicated.  RT 721-722.

11          The trial court watched the video tape of Bush's statement and thereafter ruled the

12  tape inadmissible because Bush's description of the U.S. Bank robbery was dissimilar to the

13  robbery under consideration and would therefore be confusing to the jury.  It also ruled that the

14  modus operandi of the robberies was too dissimilar to justify admitting the account of Bush's

15  robbery of Wells Fargo.  RT 750-753.

16          The Court of Appeal upheld the ruling:

17          The trial court did not abuse its discretion in excluding the evidence
           of Bush's prior and subsequent bank robberies.  To the extent
18          defendant offered evidence of Bush's crimes to show the police got
           the wrong man, the evidence was properly excluded under Evidence
19          Code section 1101.  In *People v. Davis* (1995) 10 Cal.4th 463, a
           third party's history of crimes was properly excluded under
20          Evidence Code section 1101[8] because it was offered not to show

21  _____

22          [8]  The relevant portions of California Evidence Code § 1101 are:

23          (a) Except as provided in this section and in Sections 1102, 1103,
           1108, and 1109, evidence of a person's character or a trait of his or
24          her character (whether in the form of an opinion, evidence of
           reputation, or evidence of specific instances of his or her conduct)
25          is inadmissible when offered to prove his or her conduct on a
           specified occasion.

26          (b) Nothing in this section prohibits the admission of evidence that

1    motive or intent but simply that the third party was more likely the
     perpetrator; such evidence does not link the third party to the
2    crime. . . .

3    Although Bush resembled the physical characteristics of defendant
     to some degree, as the trial court determined, the differences
4    between Bush's criminal history and the present offense were
     greater than the similarities and thus not relevant to identity.  Bush
5    was intoxicated, did not wear a disguise, and talked to the teller
     about banking prior to presenting his written demand.  The suspect
6    in the present offense was not described as intoxicated.  The suspect
     wore a hat and sunglasses, sought out the merchant teller and
7    immediately presented his demand note.  Further, the court
     determined the prejudicial effect, that is, the consumption of time
8    required for numerous witnesses and videotapes of different
     robberies, outweighed the probative value, if any.  The court was
9    entitled to so exercise its discretion under Evidence Code section
     352.[9]  We find no error.

10

11   Lodged Doc. 3 at 10-11.

12          In general, a state court's evidentiary ruling is not subject to federal habeas review

13   unless the ruling violates federal law, either by infringing upon a specific federal constitutional

14   right or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed

15   by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d

16   918, 919-20 (9th Cir. 1991).

17   /////

18   _____

19          a person committed a crime, civil wrong, or other act when
            relevant to prove some fact (such as motive, opportunity, intent,
20          preparation, plan, knowledge, identity, absence of mistake or
            accident, or whether a defendant in a prosecution for an unlawful
21          sexual act or attempted unlawful sexual act did not reasonably and
            in good faith believe that the victim consented) other than his or
22          her disposition to commit such an act.

23   [9]  California Evidence Code § 352 provides:

24          The court in its discretion may exclude evidence if its probative
            value is substantially outweighed by the probability that its
25          admission will (a) necessitate undue consumption of time or (b)
            create substantial danger of undue prejudice, of confusing the
26          issues, or of misleading the jury.

                                        27

1    A defendant has a right to present a defense, which is grounded in the Sixth

2  Amendment right to compulsory process and the due process right to a fair trial.  In <u>Chambers v.</u>

3  <u>Mississippi</u>, 410 U.S. 284, 302 (1973), for example, the court found constitutional error when a

4  trial court excluded a third party confession to the crime on hearsay grounds.

5    The Supreme Court's latest examination of the right to present a defense is <u>Holmes</u>

6  <u>v. South Carolina</u>, 547 U.S. 319 (2006).  In that case, the South Carolina court had excluded

7  evidence that another person had committed the murder with which Holmes was charged because

8  the strength of the prosecution's forensic evidence meant, in its view, that the proffered third party

9  culpability evidence did not raise a reasonable inference as to Holmes' innocence.  The Court

10  acknowledged that

11          well-established rules of evidence permit trial judges to exclude
             evidence if its probative value is outweighed by certain other factors
12          such as unfair prejudice, confusion of the issues, or potential to
             mislead the jury.
13
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
14
           [T]he Constitution permits judges to exclude evidence that is
15          repetitive . . , only marginally relevant or poses an undue risk of
             harassment, prejudice, [or] confusion of the issues.
16

17  <u>Id</u>. at 1732 (citation omitted).  It found, however, that "no logical conclusion can be reached"

18  regarding the strength of the defense evidence if a court evaluates only the prosecution's evidence

19  in determining the admissibility of defense evidence.  <u>Id</u>. at 1735; <u>see also</u> <u>Chia v. Cambra</u>, 360

20  F.3d 997, 1003 (9th Cir. 2004), <u>cert. denied</u> <u>sub nom.</u> <u>Lewis v. Chia</u>, 544 U.S. 919 (2005) (court

21  must balance importance of excluded evidence against state's interest in exclusion; court erred in

22  excluding co-conspirator's statements exculpating petitioner); <u>Wood v. State of Alaska</u>, 957 F.2d

23  1544, 1551 (9th Cir. 1992) ("Even though the evidence is relevant, it may properly be excluded if

24  its probative value is outweighed by other legitimate interests.").

25    The California Court of Appeal did not apply federal law unreasonably in

26  upholding the trial court's exclusion of the evidence of Bush's prior robbery.  As the Supreme

1    Court observed in <u>Holmes</u>, a court may exclude evidence that is only marginally relevant and that

2    might lead to confusion of the issues.   In this case, both the trial court and the Court of Appeal

3    found that the dissimilarity between Bush's robberies and the robbery of the U.S. Bank did not

4    establish Bush's identity as the perpetrator, but rather only showed his propensity to commit bank

5    robbery, which rendered the evidence only marginally relevant.  <u>See</u> <u>United States v. Spencer</u>, 1

6    F.3d 742, 744 (9th Cir. 1992) (construing a similar federal evidence rule to prohibit third party

7    propensity evidence).   Moreover, the court determined that the presentation and refutation of the

8    evidence about the other robberies would consume too much time, a determination that petitioner

9    has not challenged.

10          In addition, there was no error in excluding Bush's videotaped "confession" to the

11    U.S. Bank robbery.  This court has watched the video of Bush's statement to FBI agents after his

12    arrest for the Wells Fargo robbery.[10]  Although the sound quality of the tape is poor, one of the

13    agents asked Bush if he had done something like this before; Bush initially said no, but then said

14    he robbed the U.S. Bank.  He identified this robbery as having occurred in the winter, before

15    Christmas.  He said he did not remember much about the event because he had been drinking, but

16    did know he was wearing an army field jacket, asked the bank secretary for some paper, wrote a

17    note, but then ultimately concluded he could not go through with the robbery and so left the bank.

18    It sounds as though Bush's memory of the event was based on police reports of the incident

19    because he claimed he was in a period of black out.  This purported confession had minimal, if

20    any, probative value and a significant potential for jury confusion; the court did not violate

21    petitioner's constitutional rights in excluding it.

22    /////

23    /////

24

25        [10]  There is no counter on the tape; however, the relevant portion of the tape begins

26   around minute 58 and continues, with some meandering descriptions of other events, for
approximately sixteen minutes.

F. Improper Sentencing Factors

Petitioner argues that the court erred in counting his prior federal bank robbery as two strikes even though the sentences were imposed concurrently. Pet. at 11. This is a matter of state law, not cognizable on federal habeas. Little v. Crawford, 449 F.3d 1075, 1083 (9th Cir. 2006), cert. denied, ___ U.S. ___, 127 S. Ct. 2945 (2007).

VIII. Ineffective Assistance Of Appellate Counsel

Petitioner argues that appellate counsel was "obstinate and extremely ineffective" in refusing to raise the denial of his Marsden[11] motions on appeal. Pet. at 12.

The Strickland standards apply to appellate counsel as well as trial counsel. Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation would be "seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy."). There is, of course, no obligation to raise meritless arguments on a client's behalf. See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. See Miller, 882 F.2d at 1434. In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Id. at 1434 n.9.

/////

---

[11] People v. Marsden, 2 Cal.3d 118 (1970).

1    The court held three <u>Marsden</u> motions in response to petitioner's claims about trial

2    counsel.  The first, held July 6, 2000, concerned counsel who was eventually relieved before trial;

3    it provided no fodder for appellate issues.  In the second hearing, held November 7, 2000,

4    petitioner expressed the desire to represent himself, but then determined to proceed with counsel.

5    The third was held January 12, 2001, before sentencing.  CT 335.  As noted above, petitioner

6    complained that counsel did not present evidence that he had obtained a bank loan of $2,500,

7    which accounted for a portion of the money found in his apartment, did not object vigorously

8    enough when the court ruled that the Bush video was not admissible, and was taking some sort of

9    medication and was stressed out during his summation.  RT 1042-1043.

10    A criminal defendant has the right to the effective assistance of counsel.  <u>McMann</u>

11    <u>v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970).  Nevertheless,

12        there is no automatic right to a substitution of counsel simply
       because the defendant informs the trial court that he is dissatisfied
13        with appointed counsel's performance.

14        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

15        A trial judge is required to order a substitution of counsel if, after a
       hearing, it is demonstrated that there is a breakdown in the attorney-
16        client relationship or that an actual conflict of interest existed.

17    <u>Jackson v. Ylst</u>, 921 F.2d 882, 888 (9th Cir. 1990) (quotations omitted).  A disagreement over

18    tactics does not signal the sort of breakdown requiring the appointment of different counsel.

19    <u>United States v. Porter</u>, 405 F.3d 1136, 1140 (10th Cir.), <u>cert. denied</u>, 546 U.S. 980 (2005)

20    ("Good cause for substitution of counsel consists of more than a mere strategic disagreement

21    between a defendant and his attorney . . . .").

22    Appellate counsel did not err in failing to argue the denial of this <u>Marsden</u> motion

23    on appeal.  This court has found that counsel was not ineffective for declining to raise the issue of

24    the bank loan during trial and that there was no prejudice, even assuming that counsel's illness or

25    stress was debilitating, from counsel's argument.  Counsel's more aggressive argument would not

26    /////

1   have rendered the Bush video admissible.  Finally, the dispute over tactics would not have caused

2   the Court of Appeal to find error in the trial court's refusal to appoint new counsel.

3   IX.  Actual Innocence

4          Because petitioner is not relying on his innocence to avoid the application of a

5   procedural bar,[12] it appears that he is raising a "freestanding" actual innocence claim under

6   Herrera v. Collins, 506 U.S. 390 (1993).  Pet. at 12-13.  As the Ninth Circuit has recognized, there

7   is an "extraordinarily high" standard for such a claim, which requires petitioner to "go beyond

8   demonstrating doubt about his guilt and . . . affirmatively prove that he is probably innocent."

9   Boyde v. Brown, 404 F.3d 1159, 1168 (9th Cir.), as amended on rehearing, 421 F.3d 1154 (2005).

10   A claim must be based on reliable evidence not presented at trial.  Schlup v. Delo, 513 U.S. 298,

11   324 (1995); Calderon v. Thompson, 523 U.S. 538, 559 (1998).  A petitioner's own "late-proffered

12   testimony is not 'new' because it was available at trial," nor is a mere "repackaging of the record

13   as presented at trial."  Hubbard v. Pinchak, 378 F.3d 333, 340-41 (3d Cir. 2004), cert. denied sub

14   nom. Hubbard v. Moore, 543 U.S. 1070 (2005).  Petitioner has presented nothing but his own

15   "late-offered testimony" to support his claim of innocence; this is not sufficient.

16          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

17   writ of habeas corpus be denied.

18          These findings and recommendations are submitted to the United States District

19   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

20   days after being served with these findings and recommendations, any party may file written

21   objections with the court and serve a copy on all parties.  Such a document should be captioned

22   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

23   /////

24   /////

25

26   _____

   [12]  Petitioner did not reassert this claim in his traverse after respondent raised the issue of
   the Dixon procedural bar.

shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 10, 2007.

_____
U.S. MAGISTRATE JUDGE

2

brid2338.157